Alicia Campbell, Plaintiff's Appellant Alicia has filed a case alleging that she was fired in violation of the FMLA. My client has rheumatoid arthritis, which flares up periodically and requires for her to go to the hospital and get infusions. That's kind of the basis of the claim. I'm sure you've looked at all the record in the briefing and the many facts that are disputed in this case. And so, in preparing for this argument today, I tried to distill all of that information into one kind of overarching question that I think we should take a look at. Namely, why was Aubree Ebersole fired? And the brief kind of reflects that there are two competing stories here. The plaintiff's position would be, look, this is a violation of the FMLA and that's why she was fired. There's discrimination here. I would say the defendant's position is that there was a violation of company policy and therefore she had to be terminated. So I'm going to take each one and talk about each of the facts that support and are disputed with regards to each position. In terms of the retaliation claim, plaintiff has three types of evidence. Direct evidence of discrimination, circumstantial evidence of discrimination, and Me Too evidence of discrimination, which all appear in the record. With regards to the direct evidence, there is evidence in the record that says Ms. Ebersole took leave. And when she returned from leave, she was told if she took any further leave of any kind, that it would be seen unfavorably. I thought it was all in the context of vacation and months later. I mean, you understandably link vacation and FMLA leave, but all leaves are not of the same ilk. Yes, this was taken by my client as vacation of any kind, including a benefit of employment, namely paid vacation. Right, but that has nothing to do with FMLA leave or any other kind of leave to which the law entitles you. This was leading up to this statement that if she took any leave of any kind, it would be seen unfavorably. There were also many questions and comments about the nature of my client's sick leave, what was wrong with her, why she took it, the nature of her medical condition, and a need to investigate to find out whether or not she was the sick rep. Culminating into, in July of 2009, a direct threat that if you take any kind of leave, it will be seen unfavorably, which leads us to circumstantial evidence because my client does request paid vacation leave on August 3rd, 2009. And on August 4th, 2009, after this very long, important investigation into a policy infringement, they make the decision to terminate her. When did the investigation into the policy breach begin? In June of 2009, but no decision was made until the day after my client requested leave. What does the evidence show as to the process of the investigation? What had to transpire? What did transpire leading up to the final notice of termination? Mr. Sidorama was given information that Dr. Boda was no longer at his office starting in July of 2008. Okay, but when did he do his? That was in April.  He started in late May and got this. I bet it's the Martin that started in April. He had logged a call that he had seen Dr. Boda in April, and in May they started looking at it, and I think the record shows that in June is when Mr. Sidorama spoke with Dr. Boda about when and when he wasn't in his office. And when was the meeting? Wasn't there some kind of a meeting or conference between the plaintiff and Siriyama? Sidorama. About this? He claims that he had a conversation with my client about this. And she denies that? She has stated affirmatively that she met with his nurse practitioner. No, no. I mean, when was she questioned? The investigation, didn't it involve asking her, did you meet with Boda? And she said, no, I met with the nurse practitioner. She did say. When was that? That was shortly after, in June, I believe, the record reflects that. He asked her, did you see Dr. Boda? And he claims that she said, no, I did not see Dr. Boda. That would be another fact that's in dispute in this record, because the record also demonstrates that these calls, she was in the office of Dr. Boda, believing she talked to the nurse practitioner who worked for Dr. Boda, who was prescribing Novo products under his license, and that those calls were authorized by her then-manager, Joe Reichert, that she could enter those calls into the system. And so the record also. Were there other people there who did the same thing? It appeared that that was the case. Yes, we have. Novo has provided letters of six people that they say in the district have been fired for call falsification, but the evidence shows that there's also two people in the same district managed by the same people, where evidence was given to Novo Nordisk that they were falsifying calls and no investigation into them was made. Well, from the practical point of view, the way medicine is developed, the nurse practitioner is doing an awful lot of it. But the company had a fast rule that that couldn't, that wouldn't count. They claim to have a zero-tolerance policy, but, again, this is another fact that's in dispute. The zero-tolerance policy is not codified anywhere. What they have codified is a progressive discipline policy that did not mandate for the immediate termination of Ms. Ebersole. Additionally. Now, you're talking about the two that Reichert. Yes, and then there are. The two people he didn't like he blew the whistle on. Well, I wouldn't characterize as not liking them, but he did provide. The two people that helped, that gave him poor performance reviews leading up to his termination. There are two people who he had information on from a similar investigation as that of what Mr. Sitarama did with regards to Aubrey, that he had information that they were not going to calls and were logging them inappropriately, yes. And that information was given to Novo Nordisk, who did, who took up on no investigation. Before his termination or after? Yes, he told his. The evidence in the record is that he told his manager, Chris Connell, that he was investigating these employees and that he believed that they were falsifying calls. So. That he was investigating. That he was investigating them and that they were falsifying calls. So, with regards to the circumstantial evidence that we have in her case, we have the e-mails. August 3rd, she said she requests leave. August 4th, the decision is made to terminate. They terminate her on August 11th with her leave, supposed to be starting on August 12th. What kind of leave was requested? Paid vacation leave was requested. And additionally, Joe Reichert also testified that he believed that he had been, in terms of Me Too evidence, that he had been fired in violation of the FMLA because he was harassed by Novo Nordisk while he was on leave and then subsequently fired after taking the FMLA leave. So, that kind of represents the base case that my client has put forth. Now, obviously, Novo Nordisk, and several of these issues you've hit on, comes in and says, no, look, we have a violation of company policy. And she was not meeting with Dr. Boda when she entered the call. But even that fact is in dispute because there are different definitions as to what a call is in the manual and the handbook. And certainly what Ms. Ebersole was doing when she went out to Dr. Boda's office was indeed within the essential functions of her job as well. So, it becomes a jury question. All of these become jury questions that have to be weighed out and decide, what does the manual mean? What does the handbook mean? A call is defined as a face-to-face discussion with all health care providers. Ms. Ebersole testified she was there meeting with Ms. Buckles. She was talking and promoting Novo products. Joe Reichert comes in and says it is. I don't understand why that's a jury question. Whether or not she was there? No, what's a call? Well, because a call is defined in the manual as a face-to-face discussion with a health care provider. What issues does this address? The bona fides of the reason for termination? Absolutely. And the basis for it and whether or not it's protectual. Because a call is not explicitly defined in the manual so that it is just obvious to everyone. They say call expectations are established. What's the evidence that the two supervisors lied when they said what they believed a call meant? The fact that it was an authorized call. And then the manual called. The manual says call expectations are established. We're not talking about an authorized call. We're talking about a call that's properly logged, presumably for either pay or performance purposes. Or am I not understanding the system? Well, a call, first of all, can be a face-to-face meeting between a health care provider, which Deborah Buckles was. But there was nothing wrong with her talking to the nurse practitioner. Her own colleague said, just don't record it as a log. And that's where it comes in. Just Mr. Reichert testified that it was one call that they were calls that he could have authorized her to enter into the system. He doesn't remember saying it specifically, but he says he could have told her to enter in the system, and that's certainly the testimony in this case. I still don't understand. Okay. I don't get what the jury is supposed to find on that. Well, whether or not it was a face-to-face call with a health provider. No. But the only issue under the burden-shifting method of proof is whether the employer legitimately believed it. The supervisor is in question. Well, but there's this dispute on whether or not their policy allows a manager to authorize a person to enter a call in the system. And a jury would certainly need to determine whether or not they can believe Joe Reichert in when he says, I believe I told her to enter that call, and whether or not that was appropriate under the manual guidelines. I mean, there are several things going on here. Okay, but that's different than what's a call. You just changed the issue. Well, those would be issues I believe a jury would consider. I mean, it's within the essential functions of her job to go out and meet with people, including nurse practitioners, which is what they mean. Juries don't do findings on McDonnell Douglas. No, but they do. Juries only answer the ultimate question. And they weigh and consider evidence, people's intent, state of mind, and credibility, which in this case we have many, many issues of whether or not people believe Joe Reichert, whether or not the trial court believed Joe Reichert, the intent of people's statements when they were talking with my client on questions about her medical leave and the nature of her medical condition. In order for this order to come through and summary judgment to be appropriate in this case, there has to be a discrediting of our evidence. How is it that Reichert overcomes the lack of proximity here? I don't understand your question. Well, the lack of proximity between the FMLA leave she was allowed, the only leave she ever requested she was granted, and the determination for unrelated conduct unrelated to her condition months and months later. Well, Joe Reichert was terminated at the time my client came back out from leave, and she had a new manager. And within the first ---- Yeah, but so what? I don't understand. If I follow Judge Logan, he's asking, your client requested FMLA leave and received it. Yes. And went back to work. Yes. Worked approximately seven months. No, she came back from leave at the end of March, and she was terminated in August. Okay, so from March to August, about five months. Yes. Before termination. Yes. Most of our cases say that is too long of time, too much attenuation to support a retaliation claim. And we have harassment leading up to a direct threat in July that if she takes any more leave, she will be seen as unfavorably by the company. If she takes any more vacations. Don't take vacation this year, right? Any vacation of any kind is how my client understood it. FMLA leave is not vacation. It's something the employee does. Nobody likes it. It's a medically necessary leave. It's a benefit that is conferred upon her as being an employee. And she believed this. An employer saying you don't have any, we can't let you have any more vacation this year for one reason or another. There's no reasonable inference that has anything to do with medical, if the need for medical leave should arise. Except that she was harassed leading up to the statement about the nature of her FM. Well, we dispute that fact, Your Honor. I mean, that fact is one that we believe to be in dispute. She felt as though she was harassed. And we have testimony. The district court disagreed. So if she wasn't harassed. We have nothing but from the end of leave until I can't let you have any more vacation this year. And we have threatening statements starting immediately upon the time she returns from work, culminating in a direct threat in July that they made good on in August. And that is our reading of the evidence, that she was harassed throughout. Her supervisors were cornered. Joe Riker testifies to being cornered by her area manager about the nature of her leave and her condition. She was told that they're trying to find out who the sick rep is, culminating in a threat in July that then they made good on in August. Because the decision to terminate her is not made until she requests leave, which was what she was specifically told not to do. Thank you. Mr. Herka. Your Honors, may it please the court, my name is Tom Herka. I represent the appellee, Novo Nordiskink. The sole issue before the court here is whether the district court erred in concluding that the appellant had failed to present evidence sufficient to demonstrate that the appellee's nondiscriminatory reason for terminating Ms. Ebersole's employment was a pretext for retaliation under the FMLA. As the court duly noted, the analysis of the district court was won under the McDonnell-Douglas burden-shifting test. The court had concluded that the appellant had fulfilled the prime fishy case, and the court then concluded that the appellee had in fact presented a legitimate nondiscriminatory reason for termination. Then the burden shifted back to the appellant to demonstrate pretext. And under the Phillips v. Matthews case, there are certain ways you can develop a pretext argument. In this case, the appellant primarily relied on, as she noted today, the issue of these alleged illegal questions or threats made by her direct supervisor, Mr. Siderama. Now, these illegal questions, as characterized by the appellant, there was no support that these were illegal in any way under HIPAA. There was no case site, no authority, and the court didn't find anything illegal about the questions. Indeed, Judge Limbaugh had concluded that these were conversations between two individuals in the healthcare industry about the fact that the subordinate, Ms. Ebersole, had been on a leave of absence for a period of time, and Mr. Siderama merely asked her questions about why she was on leave. What was her condition? What medications was she taking? But notably, Ms. Ebersole had never testified or characterized the questioning as being an interrogation. She had never testified that she was in any way being vilified for having taken FMLA leave. There was never any indication that she had been admonished for taking FMLA leave. What was the use of the term sick rep and the implications for a factual dispute in this case? Your Honor, according to the appellant, she alleges that at one point during a conversation in a ride-along, which is spending an entire day in the car between two coworkers going from position to position, at some point she alleges that Mr. Siderama said to Ms. Ebersole that Chris Connell, his supervisor, had asked him which one was the sick rep and which one was the good rep. And so he conveyed that question to her. That's the allegation in this lawsuit. And that's the full extent of any testimony about that comment. And that happened sometime apparently in the summer of 2009. Was there evidence as to what the sick rep means and who that individual might be? No. There's nothing beyond Ms. Ebersole's statement that that's the question Mr. Siderama asked her. There's nothing else in the evidence beyond that. Mr. Siderama denies ever asking that question. There's nothing more beyond that. Was the good rep ever identified? No, never. Nothing in the evidence about sick rep or good rep beyond Ms. Ebersole's testimony, Your Honor. How about Connell? Was he asked about it? He was not deposed, and so there's no testimony from him. And so these questions, as the district court properly concluded, were innocuous questions and comments and discussions between two co-workers in the health care industry who spend the entire day together in the car. And again, nothing indicating a hostility toward her. FMLA leave had been taken months earlier. No affidavit from Connell? There was none, Your Honor. When both the plaintiff and Reichard had him tabbed as the bad guy? That's correct, Your Honor. No deposition taken and no affidavit, Your Honor. And so these threats, as alleged, are, in fact, as the court found, innocuous conversation between two co-workers. Notably, the threat she talks about, as the court picked up on, was a statement by Mr. Siderama that she should not take any further vacation days this year. Vacation, very specific. That's undisputed. That's Ms. Ebersole's own testimony. And as the court noted, it wasn't a statement that she should not take any more FMLA leave, she should not take any medical leave, she should not be out for health reasons. That was never said. So the sole alleged threat was don't take any more vacation days this year. Now, of course, that's a dispute, but for purposes of this hearing, we accept that as true. But, again, that does not reflect any animus toward prior FMLA leave that had been taken months earlier. And as the court noted, she had taken that FMLA leave, which I know was fully paid, and nobody had ever talked to her afterwards about that leave, and that it somehow was untoward or improper. How long did she work there? I'm sorry, Your Honor? Would you remind me how long she worked there? She had been there, I believe, for approximately two and a half years as an employee. I believe she began in 2007. March of 2007. Three and a half years. Three and a half years. Thank you, Your Honor. And as far as the harassment and legal questions, again, there is no evidence of anything illegal about the questioning. What bothers me is what evidence is there that the investigators and decision makers were aware that Reichert said he authorized the logging of these bad improper calls? Mr. Siderama, I believe his testimony was that Ms. Ebersole did not at that time during investigation state that she had been given permission. She explained she had been seeing a nurse practitioner rather than Dr. Boda. I believe Ms. Ebersole testified that she did tell Mr. Siderama that Mr. Reichert had previously approved recording those as calls, even though she had not seen the physician on record. Okay, so what did he do about that? How was that taken into account? Well, he could not because Mr. Reichert no longer worked for the company. So what? And so from his perspective. Well, he can go investigate it or he can accept it. He can't just reject it out of hand, can he? Well, he certainly can because that's in violation of written policy. The written policy makes it. But it's Reichert's violation. It's not hers. Well, it's her violation in choosing to ignore the written policy and accept the word of her supervisor. Wait a minute. I thought it was a given that there's nothing wrong with continuing to call on a nurse practitioner in a clinic that may still be a customer, even though the identified MD has gone elsewhere. No, no, no. That's a violation of company policy. It's unequivocal. In fact, Ms. Ebersole herself testified. There are no cold calls in this business? No. There is no cold calling in this business, Your Honor. And if there's a team of physicians and one has been the main contact and retires, you can't go to that office anymore? You cannot record that as a call, Your Honor. I'm not talking about recording it as a call. I'm talking about continuing to make a client contact. Your Honor, the diabetes care specialists are free to visit any physicians they wish. They merely cannot record it as a call unless they are on a call list. That's the point. Reichert said you may record this one. Well, and Reichert said he didn't recall saying that. Reichert violated the policy. You'd already fired him. Why do you need to fire a staffer who was just doing unless you're going to challenge the truthfulness of what she's reporting, and that isn't in the reasons for firing? Well, the firing itself was merely because she reported a call that was not made. And with permission of her immediate supervisor. And we did not have that at the time of the decision. We dispute that. I thought you just said she told you. She said that. She claims that. For purposes of this hearing, that's the evidence. Okay. Well, let's not make up the record, not the summary judgment record. And the position of the company is we have a written policy that says you can only record a call for one of the physicians that's in your call list. Tell me where in the record I will find that it's the company policy that when a supervisor authorizes a staffer to record a call improperly, the staffer gets fired. That is not in the policy, Your Honor. That's right. The supervisor maybe gets fired. He'd already been fired. He'd been fired already. That's correct, Your Honor. But not for that, though. He was fired long before we even found out anything about Ms. Ebersole. That was a termination unrelated to her. It was while she was on leave. I believe he was terminated either while she was on leave or just before the leave. But that was unrelated to Ms. Ebersole. Two months before this problem with the Boda Clinic was unearthed. Yes, Your Honor. I think that, to me, is the fact that maybe brings down the house for summary judgment purposes. Well, Your Honor, you have the two policies, the codes of conduct, and you also have a handbook that makes it very clear what a call is. It doesn't matter. Your reason has to be aimed at the perpetrator, not as fallout to everybody in the vicinity. A little background here, if I may, Your Honor. The policy makes it clear you can only record a call to a physician that's on your call list. She recorded a call to someone not on the call list. That's the policy in writing. Every supervisor states that. Now, her allegation is she went to her supervisor and asked, I didn't see my doctor in violation of company policy but recorded it. Is that okay? He said that's okay. If she chose to ignore the written policy and the policy of the company and listen to her supervisor, that's a risk she took. The next supervisor came in, independent of him, looked at this and said, you recorded a call you did not make. Well, we'll see whose risk it was. And at the end of the day, if you chose to listen to your supervisor rather than follow the company policy, it's a risk you take. An example I use, which is extreme. Tell me where in the handbook I'll find that. It's the definition of a call. It's in the record. There are record sites to two codes of conduct. You've already conceded what I would consider obvious, that the call, that is the physical visit, is not a violation of company policy. Indeed, an aggressive marketing organization would encourage that. All right, so it's only the recording for whatever purposes this log is created. That's the problem. That is the issue. She makes the call. Supervisor says, okay, under the circumstances, you might have had a long day on the road and so forth. You can log that. And you tell me where in the manual the person that does that, there's nothing wrong with the call, the visit, the talk. You can't get from here to there. There's nothing wrong with doing that. Now, there's a question of whether she's doing that on company time when she should be visiting people on her call list. Put that aside. We don't dissuade people from engaging in extracurricular activities. This record doesn't tell me that she knew at the time of that visit that Boda was gone. Well, there were three visits over a span of, I think, September and October of 2009. There were three separate visits. She went there, and there was no Dr. Boda. Well, okay, you show me where in the record it's established that she knew by the third visit that Boda was no longer there. I believe her testimony was that she went there three times and met with a nurse practitioner. And I believe in the testimony she actually said she thought that was sufficient, which is why she talked to record allegedly and said, can I record that? Right. And we're also told in the blue brief that 10 to 15% of the physicians on her call list said, you talked to my nurse practitioner. But if you do that, you at least have to have had a face-to-face conversation with the individual physician on your call list. No, you're making this up. No, that's the rule, Your Honor. Well, okay, you show me the testimony. Your Honor. Tell me what witness I read for that. You can look at Mr. Sidorama's testimony. Don't tell me you read the codes of conduct. No, no, Mr. Sidorama's testimony was very clear, as was Sunita Valenki, who's the HR individual. He wasn't even the manager at the time this happened. No, he was not. He was after the fact. Yes, he investigated it and found that she had recorded a call she did not make. And he's the one that, based on that, working with HR, concluded that she had violated the company policy by recording a call she had not made. Now, notably, she did not put in the computer that I had visited a nurse practitioner or I got permission from someone else to do this. She had recorded a call, knowing that you can only record a call when you meet with the physician in your call list. And that's a very critical issue because it's a very highly regulated industry, and every time you meet with a physician to talk about a drug or provide samples of drugs or literature, we must record that because that's tracked, because there are lawsuits, investigations regarding off-the-record issues where people make claims about drugs which are not accurate or approved by the FDA. And so it's critical to have accurate documentation reflecting every meeting with the health care provider. And that's why we have specific policies in place and practices whereby people must record a call only if they met with that physician. And if they choose to disregard that rule based on whether they allege a supervisor said it's okay to do so or not, that simply is not compliant with company policy. An example I use, which may be a little extreme, but I think it's valid, if you have a policy that says you cannot commit theft while on a job, very common sense, but then your boss says, oh, go ahead and take this one time, you're still not excused for misconduct. If the company finds out you stole and you say, my boss said it's okay, well, that's foolish of you. We have a company policy saying don't steal. Just because your boss said it's okay to steal one time doesn't mean you get a fine. Counsel, that's fine when you put the word stolen on it. In fact, the facts in the situation you just described would be quite disputable. Whether that's stealing or not, when the boss says go ahead, you may have that. You may do whatever. That's stealing? From a regulatory perspective, it's comparable. Your client is not a government regulator. No, but they are regulated by the government. And so if they find that there's a call listed that didn't occur, if they have a call listed that did not occur, there would be serious repercussions. That's the issue here. That's why call log accuracy is critical. You can prove, you know, there's nothing about those repercussions in this record. Your Honor, I see my time is up. May I just respond briefly? Well, yeah. I mean, what FDA or other regs are in the record that would show the terrible things that would have befallen your client if they hadn't fired the plaintiff? There's nothing from the FDA, but Sunita Valenki, the HR individual who did the investigation, testified about the requirement of document integrity, the highly regulated nature of this industry, and the requirement that such documents be as accurate as possible, which is why there have been dozens of people terminated for the same offense the very same year that the appellant was terminated. If there are no further questions, thank you, Your Honor. And which of those people had the calls in question authorized by their immediate supervisor? That's not in the record of evidence, Your Honor. Okay. Rebuttal time? She has 35 seconds, Your Honor. So with my 35 seconds, I would just direct the Court to a case that I outlined in my brief called Haidt v. Vermeer, where Judge Smith, you were the author, and Judge Murphy, you sat on the panel. And in my secondary brief, I lay out a chart because most of the facts in that case are substantially similar to the case here, in that my client took FMLA leave, she was harassed after doing so and told not to take any more time, that she was fired for doing something that the company, Joe Reichert, authorized her to do, and she also had Joe Reichert testifying that he, too, felt like he was fired for violations of the FMLA. That case went in front of a jury and returned a plaintiff's verdict. Thank you guys very much. Have a nice day. Thank you, Counsel. The case has been thoroughly and well-briefed and argued, and we'll take it under advisement.